UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIEL DURAIN,

          Petitioner,

vs.                 Case No.  2:03-cv-24-FtM-29DNF

WALTER A. MCNEIL, Secretary of the
Florida Department of Corrections,
and, BILL MCCOLLUM Attorney General
for the State of Florida,

          Respondents. [1]

_____

## OPINION AND ORDER

### I. Status

Petitioner, Daniel Durain, (hereinafter "Petitioner" or "Durain"), who is proceeding *pro se*, initiated this action by filing a Petition for Writ of Habeas Corpus ("Petition," Doc. #1) pursuant to 28 U.S.C. § 2254 on January 9, 2003.[2]  Durain challenges his state court judgment of conviction for one count of first degree premeditated murder entered in the Twentieth Judicial Circuit Court, Lee County, Florida for which he was sentenced to

_____

[1]Walter A. McNeil, the current Secretary of the Florida Department of Corrections and Bill McCollum, the current Attorney General are substituted as the proper party Respondents for James V. Crosby, Jr. and Charlie Crist pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The Petition (Doc. #1) was docketed and filed in this Court on January 13, 2003; however, the Court applies the "mailbox rule" and deems the Petition "filed on the date it was delivered to prison authorities for mailing." <u>Alexander v. Sec'y Dep't of Corr.</u>, 523 F.3d 1291, 1294 n.4 (11th Cir. 2008).

life in prison.  Petition at 2.[3]  The Petition raises the following six grounds of ineffectiveness of trial counsel: 1) failing to move for cause or use peremptory challenges to remove two prospective jurors that had been exposed to prejudicial pretrial publicity; 2) failing to object to the admission of Durain's wallet into evidence in direct violation of Florida Statute § 90.404 (1994); 3) failing to permit Durain to testify on his own behalf when Durain stressed the importance of his testifying; 4) conceding Durain's guilt during the guilt phase of the trial without the knowledge or consent of Durain; 5) failing to call available witnesses to establish prior acts of violence by the victim; and 6) failing to call available witnesses to establish Durain's voluntary intoxication and his lack of intent.  Id. at 4-11.

In compliance with the Court's Order (Doc. #3), and after being granted an extension of time and permitted to file a response in excess of the twenty-five page limit, Respondent filed a Response and Memorandum of Law on March 13, 2003 ("Response," Doc. #14).  Respondent submitted exhibits (Exhs. ##1-30) and the sixteen volume record on appeal (Doc. #16, Vols. 1-16) in support of his contentions.[4]  Petitioner filed a reply to the Response in excess

---

[3]Unless specified otherwise, all page numbers referenced herein are to the page of the identified document as it appears on the Court's case management electronic computer filing system.

[4]The Court will hereinafter refer to the exhibits that are referenced in and submitted in support of the Response as "Exh." References to the record on appeal contained within Exh. #16 will

(continued...)

of the twenty-five page limit on April 11, 2003 ("Reply," Doc. #21). Petitioner subsequently filed a Notice of Conflict [of] Authority (Doc. #28) on September 2, 2003, and a Notice of Supplemental Authority (Doc. #33) on October 25, 2004. This case is ripe for review.

## II. Procedural History

Durain was charged with the first degree premeditated murder of Glen J. Harkins ("Harkins"), which occurred on July 24, 1996. Durain was represented by Assistant Public Defender Kenneth Garber, at his jury trial held September 2, 1997 through September 5, 1997. Exh. #16, Vol. II at 199. The jury found Durain guilty of first degree murder. Id. On November 3, 1997, the same jury, after hearing evidence supporting the aggravating and mitigating factors, recommended that Durain be sentenced to death by a vote of 7 to 5. Id. On March 25, 1998, the trial court adjudicated Durain guilty consistent with the jury's verdict, and despite finding the killing was "especially heinous or cruel," rejected the jury's recommendation and sentenced Durain to life in prison. Id. at 213, lines 3-23. Prior to passing sentence, the trial court summarized the facts as established at trial as follows:

> On July 24th, '96 the body of Glenn Harkins was found by
> the sheriff's department, Lee County Sheriff's
> Department, under the defendant's bed. Mr. Harkins had
> been brutally beaten about the head with a baseball bat.
> He had been beaten with such force the skull had been

---

[4](...continued)
site to the particular volume number and corresponding page number.

fractured, his teeth had been knocked out, his nose, lips, and brains were crushed.  Direct evidence of how the crime occurred was furnished by the defendant himself in the form of a taped confession. The defendant gave several conflicting confession-confessions. Originally, the defendant told detectives that he didn't know what happened to the victim, Glenn Harkins. However, the defendant later admitted to killing him.

The facts are as follows: At the time of the crime the defendant was unemployed and penniless.  He lived in the home owned by Robert Tracy and occupied by Tracy and Harkins.

According to the defendant, on July 23rd,'96, he and Harkins went fishing for approximately - - from approximately 7:00 p.m. to 11:30 p.m. While fishing, the two men drank some beer.

After the two men arrived home from fishing, the fight erupted between Harkins and the defendant because the defendant wanted to continue drinking and Harkins had determined that the defendant had drank enough for the night.

At approximately 2:30 a.m., Tracy suggested that the defendant go to bed in order to prevent any further disorder between the two men. The defendant into his bedroom.

In his confession, the defendant stated that at approximately 4:00 a.m. he left his bedroom, retrieved a baseball bat from the laundry room, and entered Harkins bedroom where he repeatedly hit him in the head with the bat. After the beating, the defendant tied a plastic bag over Harkins' head. He then moved Harkins' body to the bedroom and pushed him under the bed- -under his bed.  In his taped confession, the defendant states:

> "That's when I take him into the room and put him under the bed. Of course, there was bags over his head, because I don't-I didn't want blood going all over the floor."

Sometime during the day of July 24th, '96, Robert Tracy went into the victim's bedroom and discovered that the bed sheets had been changed. On the floor of the victim's bedroom he discovered a tooth and bone fragments.  These

-4-

findings startled Tracy, and he asked the defendant to help him search the victim's room to see if the victim could be located. The defendant's search for the victim yielded no results and, afterwards, the defendant returned to a chair in his front - - of the television.

The defendant stated that his - - in his confession that he was watching television and waiting for Tracy to leave for work so he could dispose of Harkins' body. Eventually, Tracy left the home to request the assistance of Lee County Sheriff's Department.  The sheriff's department arrived at the Tracy home and found Harkins' body under the defendant's bed.  The body was removed from the home and taken to the medical examiner's office.

At trial, Sam Johnson, an investigator with the ME'S office and an expert in blood stain analysis, testified that blood spatter was found on the ceiling, walls, and carpet in the victim's bedroom. Based on the blood spatter evidence, the investigator concluded the bloodshed occurred on the bed and the blood spatter was consistent with blunt force injury caused by a baseball bat. The expert testified that it took a considerable amount of force to make that kind of castoff stains that he observed in the victim's room.

An autopsy was performed by the medical examiner, Dr. Manford Borges. He testified that Harkins sustained between six and 12 blunt force injuries during the attack. Harkins' skull was fractured, his nose was crushed, and lips and brain were "pulpified."  The medical examiner testified that Harkins died as a result of massive blunt trauma and possible asphyxia.

The medical examiner also testified that Harkins had wounds to his arms, hand - - arms and hands consistent with attempting to defend himself. Accordingly, the medical examiner concluded that Harkins was conscious during part of the attack.

. . . There was evidence presented at trial that the victim was alive for a period of time during the infliction of the injuries and that he attempted to defend himself.

Additionally, in the defendant's confession to the police he described his meticulous clean up efforts after the murder, which consisted of washing off the bat, washing down the walls, taking a shower to remove the blood which

had gotten on him, wiping down the shower, removing the sheets from Harkins' bed and replacing them with clean sheets, and concealing Harkins' body under the bed and the bloodstained towels and sheets in his closet.

The defendant in his statement stated:

> "Put the bat up. Then I see blood on the walls. I'm trying to think. I got to get this cleaned so Bob doesn't see it. Got some towel, tried to wipe him up, thinking, what am I gonna do with Glen.  I dragged him into my room."

Questioned by Detective Jones: "You dragged him or carried him?"

The Defendant: No. I couldn't carry him.  He's dead weight."

After the defendant had cleaned up Harkins' room, he went to sleep.

. . . Detective Jones asked him: "Did you go to sleep in the same bed - -"

The defendant said: "On top of him, right.

Detective Jones: "- - he was under?"

The Defendant: "Right, you know."

Exh. #16, Vol. II at 200-09.

Petitioner filed a direct appeal arguing that the trial court erred by: denying Durain's motion for judgment of acquittal; denying Durain's motion to suppress his confession; admitting evidence of an alleged robbery of the victim; and admitting numerous gruesome photographs. Exh. #1. The State filed an Answer Brief and Petitioner filed a Reply. Exhs. ##2-3. On February 19, 1999, the appellate court *per curiam* affirmed the state judgment,

without a written opinion.  <u>Durain v. State</u>, 731 So. 2d 660 (Fla. 2d DCA 1999); Exhs. ##4-5.

On November 8, 1999, Durain filed a *pro se* motion for post conviction relief pursuant to Fla. R. Crim. P. 3.850 raising the following ten grounds of ineffective assistance of counsel: 1) failing to move for cause or use peremptory challenges to excuse two jurors who had read about the case in the local newspaper; 2) failing to object to the admission of Durain's wallet on grounds of lack of notice; 3) advising Durain not to testify to preserve opening and closing arguments; 4) allowing Durain's absence at a pretrial hearing on a defense motion to declare death not a possible penalty; 5) not properly advising Durain of the strength and weaknesses of the State's evidence; 6) conceding Durain's guilt in opening statement without his prior knowledge or consent; 7) failing to call witnesses to testify to the victim's violent tendencies; 8) not pursuing a voluntary intoxication defense; 9) not effectively cross examining a witness to elicit an allegedly inconsistent statement; and 10) violating rules of professional conduct by the omissions alleged in grounds 1-9.  Exh. #16, Vol. I at 1-46.  By written order dated May 11, 2000, the post conviction trial court summarily denied grounds 1, 2, 4, 9 and 10 of Durain's Rule 3.850 motion and granted Durain an evidentiary hearing on the remaining grounds.  Exh. #16, Vol. II at 236-241.

Durain was represented by collateral counsel John H. Shearer, Jr., at his evidentiary hearing held on October 30, 2000, January

5, 2001 and January 25, 2001.  Exh. #16, Vols. III, IV and V.[5]  By order dated March 23, 2001, the post conviction trial court denied the remaining grounds raised in Durain's Rule 3.850 motion.  Exh. #16,  Vol. IV at 487-504.

Durain, represented by appellate counsel, James T. Miller, Special Assistant Public Defender, appealed the post conviction trial court's March 23, 2001 order raising the following three grounds of ineffective assistance of counsel: 1) conceding Durain's guilt of first degree murder; 2) failing to call available defense witnesses to establish a voluntary intoxication defense; and, 3) failing to call witnesses to establish prior violent acts of the victim.  Exh. #7.  The State filed an Answer Brief.  Exh. #8.  Petitioner submitted a Reply.  Exh. #9.  On August 23, 2002, the appellate court *per curiam* affirmed without written opinion.  Durain v. State, 829 So. 2d 212 (Fla. 2d DCA 2002); Exhs. ##10-11.  Petitioner filed a *pro se* Motion for Rehearing, which was denied.  Exhs. ##12-14.   Mandate issued October 15, 2003.  Exh. #15.[6]

---

[5]A copy of the transcript from the evidentiary hearing is contained in Exh. #16 at Vol. III (October 30, 2000 hearing); Vol. IV (January 26, 2001 hearing); and, Vol. V (January 5, 2001 hearing).

[6]During the pendency of Petitioner's Rule 3.850 motion, Petitioner also filed *pro se* collateral motions that are not pertinent to the issues in the instant Petition. Specifically, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus alleging ineffective assistance of appellate counsel on direct appeal for failing to raise a claim of trial court error, which was denied as untimely. Exhs. ##17-18. Petitioner also filed a *pro se* direct appeal regarding the trial court's denial of Petitioner's
(continued...)

### III.  Applicable § 2254 Law

_____Durain filed his timely[7] Petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Consequently, post-AEDPA law governs this action.  Abdul-Kabir v. Quarterman, 127 S. Ct. 1654, 1664 (2007); Penry v. Johnson, 532 U.S. 782, 792 (2001); Davis v. Jones, 506 F.3d 1325, 1331, n. 9 (11th Cir. 2007).  Under AEDPA, the standard of review "is 'greatly circumscribed and highly deferential to the state courts.' Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)."  Stewart v. Sec'y Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).  See also Parker v. Sec'y Dep't of Corr., 331 F.3d 764 (11th Cir. 2003). AEDPA altered the federal court's role in reviewing state prisoner applications in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002). Prior to the Court reviewing a claim on the merits, certain aspects of the AEDPA, are relevant to this matter.

---

[6](...continued)
motion for return of property seized following his arrest, which was affirmed in part and reversed in part on appeal. Exh. #24. Additionally, Petitioner filed a _pro se_ second Rule 3.850 motion, which was denied as untimely and successive. Exh. #26.  Petitioner appealed the denial of his second Rule 3.50 motion, which was denied.  Exhs. ##27-28.

[7]The AEDPA imposes a one-year statute of limitations on § 2254 actions.  28 U.S.C. § 2244(d).  Respondent concedes that due to Petitioner's collateral appeals, the Petition in this Court was timely filed.  Response at 20, n.2.  The Court agrees.

**Procedural Default**

When presented with a "mixed" petition, i.e., one containing both unexhausted and exhausted claims, a district court is ordinarily required to either dismiss the petition, Pliler v. Ford, 542 U.S. 225, 227 (2004); Rose v. Lundy, 455 U.S. 509 (1982), or, in limited circumstances and under the district court's discretion, "grant a stay and abeyance to allow the petitioner to exhaust the unexhausted claim." Ogle, 488 F.3d at 1370 (citing Rhines, 544 U.S. at 277-79). However, when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural rule, the Eleventh Circuit has held that a district court can consider the petition but treat those unexhausted claims as procedurally defaulted. Ogle, 488 F.3d at 1370. Additionally, while under the AEDPA a federal court may not grant a habeas petition that contains unexhausted claims, it may deny such a petition on the merits. LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1261 n.26 (11th Cir. 2005).

"A claim is procedurally defaulted if it has not been exhausted in state court and would now be barred under state procedural rules." Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." Henderson, 353 F.3d at 891 (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)). A procedural default may also result from non-compliance

with state procedural requirements.  See Coleman v. Thompson, 501

U.S. 722, 729-30, reh'g denied, 501 U.S. 1277 (1991).

> Federal courts are barred from reaching the merits of a state prisoner's federal habeas claim where the petitioner has failed to comply with an independent and adequate state procedural rule.  Wainwright v. Sykes, 433 U.S. 72, 85-86, 97 S. Ct. 2497, 53 L.Ed.2d 594 (1977).  When a state court correctly applies a procedural default principle of state law, federal courts must abide by the state court decision, Harmon v. Barton, 894 F.2d 1268, 1270 (11th Cir. 1990), but only if the state procedural rule is regularly followed, Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L. Ed. 2d 935 (1991). . . .

Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), cert.

denied, 127 S. Ct. 1823 (2007); see also Baldwin v. Johnson, 152

F.3d 1304, 1317 (11th Cir. 1998) (finding that federal courts may

not review a claim that a petitioner procedurally defaulted under

state law if the last state court to review the claim states

clearly and expressly that its judgment rests on a procedural bar,

and the bar presents an independent and adequate state ground for

denying relief), cert. denied, 526 U.S. 1047 (1999).  This is true

where the appellate court silently affirms the lower court

procedural bar since federal courts should not presume an appellate

state court would ignore its own procedural rules in summarily

denying applications for postconviction relief.  Tower v. Phillips,

7 F.3d 206, 211 (11th Cir. 1993).

A procedural default for failing to exhaust state court

remedies will only be excused in two narrow circumstances.  First,

a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the asserted error. House v. Bell, 547 U.S. 518, 536-37 (2006); Mize, 532 F.3d at 1190. "Cause" ordinarily requires a petitioner to demonstrate "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003) (quoting Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999)). Constitutionally ineffective assistance of counsel can constitute cause if that claim is not itself procedurally defaulted. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). To show "prejudice," a petitioner must demonstrate that there is "at least a reasonable probability that the result of the proceeding would have been different." Henderson, 353 F.3d at 892.

Second, under exceptional circumstances, a petitioner may obtain federal habeas review of a procedurally defaulted claim, even without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. House, 547 U.S. at 536; Edwards, 529 U.S. at 451; Henderson, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." Henderson, 353 F.3d at 892. See also House, 547 U.S. at 536-37 (prisoner asserting actual innocence must establish that, "in light of new evidence, it is

more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt") (citation omitted).

**Deference to State Decision**

Where a petitioner's claim raises a federal question, was exhausted, is not procedurally barred, and was adjudicated on the merits in the state courts, the federal court must afford a high level of deference to the state court's decision. See, e.g., Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008). Habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See Brown v. Payton, 544 U.S. 133, 141 (2005); Price v. Vincent, 538 U.S. 634, 638-39 (2003). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference. Ferguson, 527 F.3d at 1146; Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1253-54 (11th Cir. 2002). See also Peoples v. Campbell, 377 F.3d 1208, 1227 (11th Cir. 2004), cert. denied, 545 U.S. 1142 (2005).

"Clearly established federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions

of the United States Supreme Court at the time the state court issues its decision. Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 653 (2006)(citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). In cases where nothing in the Supreme Court's jurisprudence addresses the issue on point or the precedent is ambiguous and gives no clear answer to the question, it cannot be said that the state court's conclusion is contrary to, or constitutes an unreasonable application of, "clearly established Federal law." Wright v. Van Patten, 128 S. Ct. 743, 747 (2008); Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003).

A state court decision can be deemed "contrary to" the Supreme Court's clearly established precedents within the meaning of § 2254(d)(1) only if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court cases, or (2) the state court confronts a set of facts that is "materially indistinguishable" from those in a decision of the Supreme Court and yet arrives at a different result. Brown, 544 U.S. at 141; Mitchell, 540 U.S. at 15-16. Further, it is not mandatory for a state court decision to cite, or even to be aware of, the relevant Supreme Court precedents, "so long as neither the reasoning nor the result . . . contradicts them." Early v. Parker, 537 U.S. 3, 8 (2002); Mitchell, 540 U.S. at 16.

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies it to the

facts of the petitioner's case in an objectively unreasonable manner, Brown, 544 U.S. at 134; Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000), cert. denied, 534 U.S. 956 (2001); or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson, 234 F.3d at 531 (quoting Williams, 120 S. Ct. at 1520). The "unreasonable application" inquiry "requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-77 (2003) (citation omitted); Mitchell, 540 U.S. at 17-18. Depending upon the legal principle at issue, there can be a range of reasonable applications. Yarborough v. Alvarado, 541 U.S. 652, 663-64 (2004). Thus, the state court's decision is not subject to federal review de novo; rather, § 2254(d)(1) relief is only available upon a showing that the state court decision meets the "objectively unreasonable" standard. Id. at 665-66.

A § 2254 petitioner can also obtain relief by showing that a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). Where the credibility of a witness is at issue, relief may only be granted if it was unreasonable, in light of the evidence presented, for the state court to credit the testimony of the witness in question. Rice v. Collins, 546 U.S. 333, 338

(2006).  Additionally, a factual finding by a state court is presumed to be correct and a petitioner must rebut this "presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231, 240 (2005); Henderson, 353 F.3d at 890-91.  This statutory presumption of correctness, however, "applies only to findings of fact made by the state court, not to mixed determinations of law and fact."  Parker v. Head, 244 F.3d 831, 836 (11th Cir.), cert. denied, 534 U.S. 1046 (2001) (citation omitted).  An ineffective assistance of counsel claim is a mixed question of law and fact; therefore, the presumption does not apply and such claims are reviewed de novo. Rolling v. Crosby, 438 F.3d 1296, 1299 (11th Cir.), cert. denied sub nom. Rolling v. McDonough, 126 S. Ct. 2943 (2006).

Finally, if the state court fails or declines to rule on the merits of a particular claim raised before it, that claim falls outside of the scope of § 2254(d)(1)'s restrictions and the reviewing federal habeas court owes no deference to the state court decision when evaluating that claim.  Davis v. Sec'y Dep't of Corr., 341 F.3d 1310, 1313 (11th Cir. 2003).

### Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d).  Newland v. Hall, 527 F.3d 1162, 1183 (11th Cir. 2008).  Post-AEDPA, the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), remains

applicable to the claims of ineffective assistance of counsel raised in this case. Newland, 527 F.3d at 1184.  In Strickland, the Supreme Court established a two-part test to determine whether a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, i.e., "fell below an objective standard of reasonableness" "under prevailing professional norms," which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether the deficient performance prejudiced the defendant, i.e., there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688.  Petitioner bears a heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006), cert. denied sub nom. Jones v. Allen, 127 S. Ct. 619 (2006).  A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690), applying a "highly deferential" level of judicial scrutiny. Id.  A court must adhere to a strong presumption that "counsel's

conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.  An attorney is not ineffective for failing to raise or preserve a meritless issue. <u>Ladd v. Jones</u>, 864 F.2d 108, 109-10 (11th Cir.), <u>cert. denied sub nom. Ladd v. Burton</u>, 493 U.S. 842 (1989); <u>United States v. Winfield</u>, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"). "To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987)).

## IV. Findings of Fact and Conclusions of Law

This Court has carefully reviewed the record and, for the reasons set forth below, concludes no evidentiary proceedings are required in this Court. <u>Schriro v. Landrigan</u>, ___ U.S. ___, 127 S. Ct. 1933, 1939-40 (2007).  Petitioner does not proffer any evidence that would require an evidentiary hearing, <u>Chandler v. McDonough</u>, 471 F.3d 1360 (11th Cir. 2006), and the Court finds that the pertinent facts of the case are fully developed in the record before the Court. <u>Schriro</u>, 127 S. Ct. at 1940; <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1034 (2004).

**Grounds One, Two and Three**

Respondent points out that Petitioner raised the three ineffective assistance of counsel claims set forth in Ground One (failure to challenge two prospective jurors that had been exposed to prejudicial pretrial publicity), Ground Two (failure to object to the admission of wallet into evidence), and Ground Three (failure to permit Durain to testify on his own)in his Rule 3.850 motion, but "waived and defaulted these three grounds by not raising and arguing each" on appeal after his evidentiary hearing. Response at 14.   The post conviction trial court summarily denied Petitioner's claims set forth in Grounds One and Two, and subsequently denied the claim set forth in Ground Three after an evidentiary hearing.   Petitioner, through collateral appellate counsel, did not raise or brief any of these three Grounds on appeal after Petitioner's evidentiary hearing. Exh. #7.  Instead, Petitioner asserted and argued three other claims of ineffectiveness of trial counsel.   Id.

In Florida, exhaustion of a Rule 3.850 claim includes an appeal from its denial.   See Martin v. Sec. Dept. of Corrections, No. 6:05-cv-1815, 2008 WL 2490447 *10 (M.D. Fla. June 19, 2008)(citing Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir. 1979)[8] (finding that exhaustion requires not only the filing of a

---

[8]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to
(continued...)

Rule 3.850 motion, but also an appeal of its denial)).  In particular, because Petitioner was afforded an evidentiary hearing in connection with his claims, Petitioner was required to file a brief upon appealing the final order denying his Rule 3.850 motion. See Fla. R. App. P. 9.141(b)(3); Shere v. State, 742 So.2d 215, 224 n.6 (Fla. 1999); Cortes v. Gladish, 216 Fed. Appx. 897, 899-900 n. 2 (11th Cir. 2007); Williams v. McDonough, No. 8:02-cv-965T-30-MAP, 2007 WL 2330794 *1-2 (M.D. Fla. 2007).

Petitioner concedes that the claims raised in Grounds One, Two and Three of his Petition were "not exhausted at state level." Petition at 5, 6, and 8.  In his Reply, Petitioner argues that because certain of the grounds of his Rule 3.850 motion were summarily denied, he was not required to brief those issues on appeal.  Reply at 4.  Petitioner refers the Court to the Notice of Appeal filed in connection with the denial of his Rule 3.850 motion and asserts that the Florida appellate court "was given adequate and proper notice of the summarily denied issue[s] . . . when court appointed counsel enumerated the issue in the Judicial Acts To Be Reviewed."  Id.

After review of the notice petitioner provided to the Florida appellate court in connection with the denial of Petitioner's Rule 3.850 motion, the Court finds that Petitioner did not "fairly present" the claims raised in Grounds One, Two and Three to the

---

[8](...continued)
the close of business on September 30, 1981.

state court.  See Baldwin v. Reese, 541 U.S. 27, 27-28 (2004) (finding that a petitioner does not "fairly present" a federal claim to a state court if the court if the state court is required to read beyond the petition, brief, or paper to be alerted to its presence).  In the 'Statement of Judicial Acts To Be Reviewed,' Petitioner only claimed that the trial court "committed error by denying an evidentiary hearing on portions" of the Rule 3.850 motion.  Exh. #16, Vol. 5 at 611.  In his Initial Brief on appeal, as well as in his Reply Brief, Petitioner only identifies the claims set forth in Ground Four, Five and Six.  Exhs. #7 and #9. Thus, nowhere did Petitioner alert the appellate court to the claims articulated in Ground One, Two or Three.  Consequently, the Court finds that these claims were not exhausted in state court and are now procedurally barred.  Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008).

Alternatively, in an effort to excuse his procedural default, Petitioner cites ineffectiveness of appellate counsel as cause for his default.  In particular, Petitioner states that his failure to fully exhaust these claims was "due to appointed appellate counsel's failure to argue claim in the 3.850 briefs."  Petition at 5, 6, and 8.  While Petitioner suggests that his Rule 3.850 appellate counsel was constitutionally ineffective for failing to raise these issues on appeal, such a claim does not constitute cause.  The Supreme Court has held that "[t]here is no constitutional right to an attorney in state post-conviction

proceedings," and "[c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman v. Thompson, 501 U.S. 722, 753-54 (1991). "A petitioner cannot establish constitutionally ineffective assistance of counsel in state post-conviction proceedings because there is no constitutional right to an attorney in such proceedings." Jimenez v. Sec'y Dep't of Corr., 481 F.3d 1337, 1344 (11th Cir. 2007). See also Mize v. Hall, 532 F.3d at 1191 ("Because a petitioner has no right to counsel during state collateral review, even grossly ineffective assistance at the collateral review stage, or no assistance at all, does not constitute cause to excuse a procedural default."). Consequently, Petitioner has not shown either cause or actual prejudice to excuse his default. Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003). Furthermore, Petitioner does not show that he is entitled to the fundamental miscarriage exception. Thus, the Court will dismiss Grounds One, Two and Three of the Petition as unexhausted in the State court and procedurally barred.

**Grounds Four, Five and Six**

Petitioner was afforded a full and fair evidentiary hearing in connection with Grounds Four, Five and Six of the instant Petition, at which Petitioner was represented by collateral counsel. The evidentiary hearing "was held over three different dates at the request of Defendant's counsel for the purpose of allowing counsel the opportunity to produce witnesses who were unavailable for the

originally scheduled hearing." March 23, 2001 Order Denying Rule 3.850 Motion for Post Conviction Relief after Evidentiary Hearing, ¶2 (Exh. #16, Vol. IV at 487).

The appellate court *per curiam* affirmed the trial court's ruling without written opinion. Exh. #10. Thus, the state's court decisions are entitled to deference unless it is contrary to or involves an unreasonable application of <u>Strickland</u>, or was based on an unreasonable determination of the facts in light of the evidence presented in the underlying state court proceedings.

With respect to each of his claims, Petitioner argues that "the courts below have either overlooked and/or misapprehended [his] federal constitutional rights that have been violated on this claim." Petition at 28. Respondent argues that these grounds are exhausted only to the extent raised below, and moves for summary judgment on each of the claims based upon Petitioner's failure to "meet his burden under the highly differential standards of the AEDPA." Response at 31. The Court will address each claim in turn.

   **<u>Ground Four</u>      Conceding Durain's guilt during the
                 guilt phase of the trial without the
                 knowledge or consent of Durain.**

Petitioner argues that counsel's "performance was below a normal standard of professional reasonableness in that counsel conceded the Petitioner's guilt." Petition at 29. Petitioner states that he and defense counsel had agreed upon the defenses of voluntary intoxication and fear of the deceased, but Petitioner was

not aware that counsel "would pursue these defenses in this manner and would have objected had he known." _Id._ In particular, Petitioner contends that counsel conceded the elements of premeditation during voir dire, in his opening statement to the jury and in the closing, and complains that he did not consent to this trial strategy. _Id._ at 30. Respondent maintains that counsel's concession that Durain killed the victim was a proper trial strategy to maintain credibility with the jury, given the fact that Durain had given a detailed confession to police admitting the fact and manner of the killing. Response at 39-40. Further, Respondent argues that counsel did not concede that the killing constituted first degree murder. Instead, counsel acknowledged undisputed facts and urged the jury to focus on the lack of Durain's intent in an effort to steer the jury to finding a lesser charge. _Id._

Petitioner was represented at trial by Public Defender Ken Garber, who practiced law for approximately thirty years.[9] EH at 290. The following is the entirety of counsel's opening statement at trial:

---

[9]"When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." _Chandler v. United States_, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc), _cert. denied_, 531 U.S. 1204 (2001). _See Williams v. Head_, 185 F.3d 1223, 1229 (11th Cir. 1999) (noting that "[i]t matters to our analysis" whether the attorney is an experienced criminal defense attorney), _cert. denied_, 530 U.S. 1246 (2000)).

MR. GARBER: Yes, sir. Thank you, Judge. Members of the jury, generally, I don't get too much into the facts in opening statement, because what lawyers say isn't evidence.

I will say this. That Ms. Chappell's rendition of the facts is pretty accurate. I think that the testimony will basically follow and be consistent with what she's told you. She has left a few things out that I think you will hear. I will just mention them briefly.

I think the evidence will show that there was a good bit of drinking going on the night, that these two fellas, Glenn and Dan, went fishing. In fact, I think the evidence will show that between them, they drank a case of beer. You will hear that from the confession that Mr. Durain made, the one that she alluded to in part.

Also, you will hear that --- that there was I think it was 19 or 20 cans of beer found in a little tray or something, a little container in the back one of the pick up trucks, which is consistent.

There were empty cans, a few soda pop cans, but mostly beer cans. If I remember correct, it's 19 or 20, could be 23 somewhere in that range. I don't remember the exact number, but they were found in the bed of one of the trucks.

There were two trucks in the driveway to the residence when the police came out there that night. You will see that evidence as well. It indicates that there was quite a bit of beer drinking going on.

In fact, in Dan's statement, he will indicate to the officer that he was drunk that night. You will also hear testimony from some witnesses who came out to the scene after that altercation. I think the time would be say 1:30. You will hear testimony on that as to his condition. At that time you will hear testimony.

All I ask you to do is pay very close attention to all the testimony, all the evidence in this case. I think it's important that you do so. Many of the facts in this case are not in dispute.

As I've said in voir dire, will say it again in opening statement. There is no question, we are not contesting that Dan Durain killed Glenn Harkins on July 24th, 1996.

He did do that.  He did it with a baseball bat.  He did
it in a violent, brutal manner.  He struck him anywhere
from 5 to 12 times with a baseball bat, fracturing his
skull numerous times, even injuring him on the chest with
the bat.

There were defensive wounds as Ms. Chappell indicated.
It was a very violent act.  The real question and issue
in this case was did he do this with the premeditated
intent to kill Glenn Harkins?

I ask you to pay very close attention to the evidence. I
remind you that it's the State's burden to prove beyond
every reasonable doubt that key element in this case.  I
ask you not to ever shift that burden.  That burden
starts out with the State.  It stays with them.  It never
shifts.  To do so would be not to follow the law.

You have all sworn to follow the law in this case.  And
we have every confidence that you will do so, bring this
case to a fair result.  With that in mind, I will leave
you, let you hear the evidence in this case.  Thank you.

Exh. #16, Vol. Supp. IX at 429-432.

During closing argument counsel acknowledged that the victim

was "dead because of criminal acts by Dan Durain." Exh. #16, Vol.

Supp. XI at 954, lines 6-11.  Counsel then directed the jury to

focus on the third element of the crime of which Durain had been

charged.  Id.  In relevant part, counsel argues as follows:

The third element is the one in question here.  And
that's it was done with a premeditated design, that it
was done with premeditation on Mr. Durain's part, the
killing was.  That's been the crux of this case from the
start in my view.  In my submission it's not proven
beyond a reasonable doubt.

Id. at lines 12-18.  Counsel then laid out in detail evidence of

Durain's intoxication, which was introduced during the trial. Id.

at 954-964.

The post conviction trial court expressly adopted and applied the _Strickland_ analysis in evaluating each of Petitioner's ineffectiveness claims.   _See_ Exh. #16, Vol. IV at 488, ¶4.   In denying this claim, the post conviction trial court found:

> Defendant testified that counsel conceded his guilt to the jury without first discussing the strategy with him. According to Defendant, the planned strategy was not to concede guilt, but, rather "[o]ur strategy was intoxication and that I feared for the victim." (T2.64). The Court notes that, in utilizing a defense of intoxication or that the Defendant feared for his safety, it is inherently necessary that Defendant concede that he did commit the act.   Defendant never claimed that he didn't kill the victim and never claimed that it was his intent to proceed with a trial strategy in which he denied killing the victim.   In fact, Defendant admitted in his sworn confession and at the evidentiary hearing that he beat the victim to death with a baseball bat.
>
> Mr. Garber testified at the evidentiary hearing as follows:
>
> "A.  . . . what I probably did in this case was conceded the fact that Dan had killed Glen Harkins and tried to narrow the issue and get the jurors to think about the issue of what his state of mind was at that time.
>
> Q.   In other words, focus on the premeditation elements of the case?
>
> A.   Right.   As to whether this was done was with the intent to kill versus done in a rage." (TI. 55).
>
> A.   . . . I didn't feel like in this case it would be productive to contest the fact that he killed Mr. Harkins and make and issue out of that.   The real issue of the case was what his state of mind was at the time, whether there was a depraved mind, a reasonable ill will, spite, that type of thing we have on second degree." (T1. 57).
>
> Even though counsel did not have a specific recollection of discussing this aspect of the trial strategy, he testified that he thinks he did talk to Defendant about it and that it's something that he would have done to let

him know where he was going with the case and what to expect.  (T1.56-57).

Defendant agreed that the trial strategy would be to argue to the jury that he killed the victim due to intoxication and fear for his own safety, and that the killing was not premeditated.  It is not reasonable for Defendant to now claim that counsel could possible have made these arguments without conceding that Defendant killed the victim.  Considering the testimony offered at the evidentiary hearing, in conjunction with the fact that Defendant provided police with a voluntary confession admitting to the details and circumstances of the victim's death, the Court finds that Defendant has failed to demonstrate that counsel's performance was deficient within the meaning of Strickland.

The Court has carefully considered the case of Nixon v. Singletary, 758 So.2d 618 (Fla. 2000),[10] in which defense counsel conceded that defendant was guilty of premeditated first degree murder in an effort to persuade the jury to spare the defendant's life during the penalty phase.  In the case at bar, it is undisputed that, even though counsel admitted that the Defendant killed the victim, he did not concede that Defendant was guilty of premeditated first degree murder.  Based on the agreed trial strategy of presenting a defense of intoxication and fear of the victim, counsel conceded that Defendant killed the victim, but, again, in accordance with the agreed trial strategy, maintained that it is not premeditated.  The State retained the burden of proving premeditation.  In light of the circumstances and the agreed trial strategy as to the defenses, the Court finds that Defendant has failed to demonstrate that counsel was ineffective within the meaning of Nixon or United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984).  See Harris v. State, 768 So. 2d 1179(Fla. 4th DCA 2000).

Id. at 492-493, ¶¶19-2

---

[10]Subsequent to the Florida court's ruling, the United States Supreme Court in Florida v. Nixon, 543 U.S. 175, 176 (2004), held that even defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt at the guilt phase of a capital trial did not automatically render counsel's performance deficient.

In order to be convicted of premeditated murder in Florida at the time of Petitioner's trial, the State was required to prove the following elements beyond a reasonable doubt:

1.   Victim is dead.
2.   The death was caused by a criminal act.
3.   There was a premeditated killing of the victim.

> Killing with premeditation is killing after consciously deciding to do so.  The decision must be present in the mind at the time of the killing.  The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing.  The period of time must be long enough to allow reflection by the defendant.  The premeditated intent to kill must be formed before the killing.

Standard Jury Instruction in Criminal Cases (97-1), 697 So. 2d 84 (Fla. 1997).

Contrary to Petitioner's assertion, defense counsel did <u>not</u> concede Petitioner's guilt to the charge of First Degree Premeditated Murder.  While counsel admitted that Durain killed the victim, he specifically directed the jury to focus on "the real question and issue in this case," whether Durain killed the victim "with the premeditated intent."  Exh. #16, Vol. Supp. IX at 431, lines 16-18.  Consistent with the agreed upon trial strategy of raising intoxication and Petitioner's fear of the victim, counsel laid the groundwork for arguing that Petitioner was guilty of the lesser offense of Second Degree Murder.  Thus, counsel's decision to admit to these uncontested facts was a tactical decision and is entitled to deferential review under <u>Strickland</u>, 466 U.S. at 689.

The decision of the state court about this strategic choice was not unreasonable.

Even assuming that counsel did not obtain Petitioner's consent to admit to the lesser offense, such decision by counsel is not ineffective *per se*. Florida v. Nixon, 543 U.S. 175, 176 (2004). Here, the record amply demonstrates that counsel was faced with overwhelming evidence of Petitioner's guilt of the charge, including Petitioner's own detailed confession. Consequently, upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of Ground Four because the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Consequently, the Court will deny Ground Four of the Petition.

**Ground Five**      **Failure to call available witnesses to establish prior acts of violence by the victim.**

In his Memorandum in support of his Petition, Petitioner identifies the following as witnesses who defense counsel failed to call and who were available to testify to the victim's propensity for violence: Barbara Elliot, Ssteven McDonald and Denise Stover. Doc. #2 at 10-11.

The post conviction trial court, upon review of the record and the testimony presented at the evidentiary hearing, denied this claim as follows:

> Defendant claims that counsel was ineffective for failing to call witnesses who would have testified to the violent tendencies of the victim and established that Defendant feared the victim. Defendant identified in his motion Steven McDonald, Denise Stover, and Barbara Elliott, and called each as a witness at the evidentiary hearing. Even though Defendant called Tabitha Williams to testify at the evidentiary hearing, she was not identified under Ground 7 of Defendant's motion.
>
> Even though Steven McDonald did state that the victim was "a loudmouth" and "obnoxious," he further testified as follows:
>
> > Q.  Do you know his reputation in the community for violence?
> >
> > A.  He was just a loudmouth; I never seen him hit anybody.
> >
> > Q.  Did he had a reputation for being violent?
> >
> > A.  No, I never heard nothing. (T1.37).
>
> When asked if the victim threatened people, Steven McDonald replied "No." (TI. 38).
>
> When asked if she had formed an opinion as to the victim's reputation for violence, Denise Stover replied as follows:
>
> > "Only what I saw when I was with Danny.  I have never come to know him, other than when he was around Danny." (T3.23).
>
> She further testified that "[t]he only person that I know that Glenn knows was Danny, Bob Tracy, who they both lived with, and Dennis Perry, who they both lived with." (T3.26).  On cross examination, Denise Stover again explained that she didn't know the victim well and even admitted that "he was always nice" to her:

Q: Do you know Glenn Harkins' reputation in the community for violence?

A:  I Don't.  All I know is what I've already said is that whenever I have seen him with Danny, he was - - he was always nice to me. He - - he's yelled at Danny, I have heard him in an argument with Bob one day when I went to pick up Danny, but never have I - - I don't know his relationship to the community because I didn't know him well enough to know his relationship with the community. (T.3.28).

The only people from whom she heard that the victim was violent were the three people she previously mentioned. (T3.29).

Even though Barbara Elliot testified to an incident which occurred between the victim and her husband, she also stated that she had never had any confrontations or been threatened by the victim and that she never felt threatened by any of his comments. (T1.43).  When asked if she knew of the victim having a reputation in the community for violence, Barbara Elliot replied, "No." (T1.43).

Defense counsel, Mr. Garber, explained his reasons for not calling the witnesses identified by Defendant in his motion:

A:   Regarding Mr. Harkins reputation in the community for fights in, I was never able to find any witnesses that said he had a reputation in the community for being a violent person.  The people that I talked to - - an you heard some of them today - -said he was kind of obnoxious and a loudmouth, but that's as far as it went.  They never heard of him fighting in the community or anything violent.

Q.  . . ., but didn't this lady here today [Barbara Elliot] say he took a gun to her husband?

A.   She said it in her deposition.  I went and talked to her husband, who was a trooper, and he denied that ever came out. He said there was never a gun in that incident ..."

-32-

A.   . . . it is a specific act; it is not
reputation evidence. It is one specific act of
violence.  And I didn't know if it would be
admissible.  Plus,  I  found  it  didn't
corroborate.   The  witness  to  whom  it
supposedly happened to, said it didn't happen.
(T1.62-64).

Q.  What about the kid's testimony [Steven
McDonald] in regard to him coming over there
and seeing the incident with his dad and the
neighbor having to grab him and stuff like
that?

A.  I  don't  remember  anything  about a
neighbor grabbing him.  But, again, basically
what I got out of all these people was Glenn
had been their neighbor.  He was a loudmouth
and kind of irritating and obnoxious, but he
did not have a reputation for violence that
they were aware of."

A.   . . . So am I going to call this woman to
testify to have the judge possibly rule that
it is not admissible evidence and then lose
the right for opening and closing argument? I
felt like the risk there was too great, and I
would rather keep the closing argument. I
refer to them as the sandwich.  That was part
of my decision-making process as to why I
didn't call any of those people. (T1.62-65).

Considering the testimony offered at the evidentiary
hearing, the Court find that counsel had valid and
sufficient tactical reasons to not call the identified
witnesses. Defendant has failed to demonstrate the
counsel's performance was deficient within the meaning of
Strickland.   See  Van Poyck v. State, 694 So.2d 686
(Fla.1997).

Exh. #16, Vol. IV at 493-96, ¶¶23-28.

The record supports the trial court's findings. Defense
counsel explained that he investigated each of the incidents
concerning Mr. Harkins, and found no evidence that Mr. Harkins had

a reputation in the community for violence. Exh. #16, Vil. IV at
583. A trial counsel's failure to call a witness constitutes
ineffective assistance of counsel only if the witness may have been
able to cast doubt on the defendant's guilt. Pace v. State, 750
So. 2d 57 (Fla. 2d DCA 1999). Here, counsel clearly determined
that what little, if any, benefit he might obtain from the
witnesses' testimony, assuming their testimony would even be
admissible, did not outweigh the benefit to retaining opening and
closing argument. Exh. #16, Vol. IV at 583. Counsel's ability to
retain the right of presenting both opening and closing arguments
to the jury is recognized as a "distinct advantage." Dingle v.
Sec'y Fla. Dep't of Corr., 480 F.3d 1092, 1100 (11th Cir. 2007).
Here, the Court finds that Petitioner does not overcome the
presumption that, in light of these circumstances, defense
counsel's tactical decision constituted sound trial strategy.
Strickland, 466 U.S. at 689. Because Durain has failed to
establish the deficient performance prong of his Strickland claim,
the Court need not address the prejudice prong. Id. at 697.

Consequently, upon a thorough review of the record and the
applicable law, it is clear that Petitioner is not entitled to
relief on the basis of Ground Five because the state court's
adjudication of the claim was not contrary to clearly established
federal law, did not involve an unreasonable application of clearly
established federal law, and was not based on an unreasonable
determination of the facts in light of the evidence presented in

-34-

the state court proceedings.   28 U.S.C. § 2254(d).   Consequently, the Court will deny Ground Five of the Petition.

**Ground Six**   **Failure to call available witnesses to establish Durain's voluntary intoxication and lack of intent.**

In his Memorandum in support of the Petition, Petitioner identifies Dr. Robert White, Dr. Bruce Cromwell, and Tabitha Williams as available witnesses who would have testified Petitioner's intoxication the night of the incident. Doc. #2 at 5-10. In particular, Petitioner states that Dr. White, a toxicologist retained by defense counsel, would have testified that Petitioner's blood alcohol levels would have been between .184 and .246 on the night and early morning of the murder, which according to the "Dubowski Chart" would have put Petitioner in either the excitement or confusion stage. Doc. #2 at 6. Dr. White testified during the evidentiary hearing. Exh. #16, Vol. III at 7-19. Petitioner also faults counsel for failing to call Ms. Williams, a neighbor who observed and spoke with Durain at 1:20 a.m. when he knocked on her door. Petitioner contends that she would have testified that he was "intoxicated" and in an "emotional state prior to the killing." Doc. #2 at 11. Ms. Williams also testified during the evidentiary hearing. Exh. #16, Vol. III at 19-29. Finally, Petitioner complains that counsel was ineffective for failing to call Dr. Cromwell during the guilt phase. Dr. Cromwell was called by the defense to testify during the penalty phase. Respondent contends that Petitioner did not identify Dr.

Crowell in his Rule 3.850 motion and argues that any issue of ineffectiveness based on the failure to call Dr. Cromwell during the guilt phase is procedurally barred.  Response at 57.

The post conviction trial court, upon review of the record and the testimony presented at the evidentiary hearing, denied this claim and found as follows:

> Defendant claims that counsel failed to establish a voluntary intoxication defense. Defendant testified at the evidentiary hearing that during the day prior to the incident, he drank a bottle of scotch and then, in the evening, numerous cans of beer. (T2.57-59).  Defendant went to sleep and was woken by the victim at approximately 4:00 a.m., and it was shortly thereafter that Defendant killed the victim. (T2.54-55, T2.71).  The Court notes that Defendant did not mention drinking any scotch in his statement given to police.  (T2.79).
>
> At the evidentiary hearing, Defendant called as a witness Dr. White, a toxicologist, who was hired by Mr. Garber "to take drinking scenarios by Mr. Durain and convert those into drinking patterns using a computer simulation, and then correlate this with observations that were made of Mr. Durain during the night, specifically, at 1:30, and then try to correlate this with his clinical condition at either 4:00 or 4:30 in the morning." (T1.10).
>
> Mr. Garber testified that he first contacted Dr. White "to see if we could get a specific number put on the level of intoxication that Dan had at the time of the alleged offense." (TI. 66). But, approximately a month after Dr. White gave his deposition, he called Mr. Garber and said that he failed to take into account a rapid elimination rate and that when he took that into account, it would change his numbers regarding the blood alcohol level.  (T2.67-68).
>
> One scenario considered by Dr. White was Defendant having consumed twelve beers, which is the approximate amount of alcohol reported by Defendant in his sworn statement to police.  Since Defendant did not mention the scotch in his statement, unless he testified, the jury would only have before it the fact that Defendant consumes

approximately twelve beers. (TI. 69). When Dr. White
utilized the twelve beer scenario, he found that, if a
high metabolizer, Defendant's alcohol level would have
been down to .000 by 4:30 a.m., and if a regular
metabolizer, it would have been down to between .138 to
.179 (T1.67-68).

Even though Defendant called Dr. Bruce Crowell (a
clinical psychologist appointed pretrial to assist the
defense) to testify at the evidentiary hearing as to his
finding of the effect of alcohol on Defendant, Dr.
Crowell was not identified in Ground 8 of the motion. In
addition, Dr. Crowell was not listed in Ground 7 as a
witness that counsel was ineffective for not calling to
bolster the defense of voluntary intoxication.

Considering the evidence presented and considering the
facts and circumstances involved, the Court finds that
counsel had sufficient tactical reasons to decide to not
call Dr. White as a witness. Defendant has failed to
demonstrate that counsel's performance as it relates to
the intoxication defense was deficient within the meaning
of <u>Strickland</u>.

Exh. #16, Vol. IV at 496-97, ¶¶ 29-34.

The trial court expressly failed to address the merits of
Petitioner's claim based on counsel's failure to call Dr. Crowell.
Indeed, the court in its opinion pointed out that Petitioner had
failed to identify Dr. Crowell in his Rule 3.850 motion. Exh. #16,
Vol. IV at 496-97, ¶33. On appeal to the appellate court,
Respondent argued that an ineffective claim based upon Dr.
Crowell's testimony was procedurally barred. Exh. #8 at 41. The
appellate court *per curiam* affirmed. Exh. #10. Consequently, the
Court finds that Petitioner is procedurally barred from raising
this claim before this Court. <u>Bailey v. Nagel</u>, 172 F.3d 1299, 1303
(11th Cir. 1999); <u>Bennet v. Fortner</u>, 863 F.2d 804, 807 (11th Cir.
1989). Further, Petitioner fails to articulate any cause to excuse

the default and any actual prejudice resulting from the bar.   Smith
v. Jones, 256 F.3d at 1138.   Additionally, Petitioner has not shown
that he is entitled to the fundamental miscarriage of justice
exception.

Alternatively, the Court finds that the record amply supports
counsel's decision not to call Dr. Crowell during the guilt phase.
Dr. Crowell, was appointed by the trial court to prepare a
psychological assessment of Petitioner prior to trial as a
consultant to defense counsel, and testified only during the
penalty phase of the trial.   Exh. #16, Vol. IV at 5-6, 12, Vol. V
at 336.   Dr. Crowell confirmed in his report prepared for defense
counsel he opined that:

> Because of [Durain's] extreme stress level, intensified
> by alcohol, there is some doubt as to his ability to
> fully appreciate his conduct and that his ability to
> monitor or control his conduct was significantly
> impaired.

Id. at Vol. IV at 425-26.   Dr. Crowell agreed with the court that
his opinion was "a mitigating factor, were [Durain] to face the
death penalty or that type of situation, as opposed to making it
impossible for [Durain] to understand the nature of his conduct to
the requirements of law."   Id. at 430, lines 12-19.   Dr. Crowell
denied that he could offer an opinion as to whether Durain acted
with premeditation at the time of the incident.   Id. at 431.
Indeed, Dr. Crowell testified that "it's guesswork, as far as what
took place, you know, that evening . . . ."   Id. at 432, lines 8-9.
Consequently, Petitioner fails to show how Dr. Cromwell's testimony

would have been beneficial in showing that he did not act with premeditation.   In fact, during the mitigation phase, the trial court rejected Dr. Crowell's assessment of Durain's "mental or emotional disturbance as a statutory mental mitigator."  Exh. #16, Vol. II at 206-07.

Further, the record supports the trial court's findings that counsel's decision not to introduce further testimony as to Durain's intoxication was a matter of trial strategy.  The record also demonstrates that counsel made an informed decision to forego the testimony of both witnesses after weighing the potential benefits against the potential detriments of each witness.  Defense counsel explained that he decided against calling Dr. White because Dr. White telephoned counsel approximately a month after Dr. White's deposition, and advised counsel that when making his calculations, he failed to take into account "a rapid elimination rate."  Dr. White explained to counsel that Durain's alcohol rates would have been lower taking into account this additional information.  Id. at 313.  Especially, if Petitioner was a "rapid eliminator."  Id.

Similarly, although Ms. Williams observed that Petitioner was bloody and in an emotional state at 1:20 a.m., when he arrived at her door asking her to call the police, she could not testify as to his level of intoxication between 4:00 a.m. and 4:30 a.m., the time of the murder.  While Ms. Williams acknowledged that Durain "was slurring his words" at 1:20, id. at 267, line 6, she also stated

that Durain "made sense to [her]" and "knew what was going on" at that time.  Id. at 272, line 17 and 275, line 4.

Counsel had subpoenaed both Dr. White and Ms. Williams for trial but decided against calling either witness.  Exh. #16, Vol. III at 47-48.   In light of the potential weaknesses in the witnesses' testimony, counsel reasonably decided neither testimony justified losing opening and closing.   Id. at 319.   Counsel explained "[i]t is a weighing process."   Id. at line 21.   "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision and it is one that [the courts] will seldom, if ever, second guess."   Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995).   Further, Petitioner can not show that either Dr. White's or Ms. Williams' testimony would have changed the result of the trial since the fact that Petitioner was drinking and intoxicated at 1:20 a.m. would not necessarily have negated his intent three hours later, at the time of the murder.   See Linehan v. State, 476 So.2d 1262, 1264 (Fla. 1985)(The court emphasized that a defendant who asserts the defense of voluntary intoxication must establish "evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged."   The court further rejected that the "use of intoxicants" equates to "intoxication.").

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of Ground Six because the state court's adjudication of the claim

was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Consequently, the Court will deny Ground Six of the Petition.

Any other claim not specifically addressed is found to be without merit under the legal principles set forth above.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition for Writ of Habeas Corpus is denied.

2.    The **Clerk of the Court** shall enter judgment accordingly; terminate any pending motions; and close this file.

**DONE AND ORDERED** in Fort Myers, Florida, on this ___12th___ day of November, 2008.

_____
JOHN E. STEELE
United States District Judge


SA: hmk
Copies: All Parties of Record

-41-